UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER MCDOWELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| DALLAS COUNTY, TEXAS, | § | |
| | § | JURY DEMANDED |
| Defendant. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

> **Christopher McDowell was incarcerated for roughly two months in the Dallas County jail after his lawful release date. He was thus illegally held as a prisoner. This occurred as a result of well-known policies, practices, and/or customs of Dallas County.**



Table of Contents

| | | | |
|---|---|---|---|
| I. | Introductory Allegations | | 3 |
| | A. | Parties | 3 |
| | B. | Jurisdiction and Venue | 3 |
| II. | Factual Allegations | | 4 |
| | A. | Preliminary Statements | 4 |
| | B. | Plaintiff's Unlawful Incarceration in the Dallas County Jail | 5 |
| | C. | Liability of Dallas County | 7 |
| | | 1. Introduction | 7 |
| | | 2. Dallas County Policies, Practices, and Customs | 8 |
| | | 3. Other Incidents Demonstrating County Practices and/or Customs | 10 |
| III. | Causes of Action | | 13 |
| | A. | Fourteenth Amendment Due Process Claims Under 42 U.S.C. § 1983 | 13 |
| | B. | Remedies for Violation of Constitutional Rights | 15 |
| | C. | Cause of Action against Dallas County under 42 U.S.C. § 1983 for Violation of Constitutional Rights | 16 |
| IV. | Concluding Allegations and Prayer | | 17 |
| | A. | Conditions Precedent | 17 |
| | B. | Use of Documents at Trial or Pretrial Proceedings | 17 |
| | C. | Jury Demand | 17 |
| | D. | Prayer | 17 |

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

I.  Introductory Allegations

  A.  Parties

  1.  Plaintiff Christopher McDowell is a natural person.

  2.  Defendant Dallas County, Texas ("Dallas County" or "the County") is a Texas county. Dallas County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Clay Jenkins, at 500 Elm Street, Suite 7000, Dallas, Texas 75202, or wherever he may be found. Service on Judge Jenkins is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a). The County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions or failures to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983). Plaintiff is not required to allege the identity of County's chief policymaker in his complaint. However, to the extent necessary, Plaintiff alleges that the County may have delegated relevant policymaking authority to one or more individuals, including but not necessarily limited to the County Sheriff. The County's policies, practices, and/or customs were moving forces behind and caused, were proximate causes of, and were producing causes of constitutional violations and resulting damages referenced in this pleading.

  B.  Jurisdiction and Venue

  3.  The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(a)(4), because this suit presents a federal question and seeks relief

pursuant to federal statute(s) providing for the protection of civil rights. This suit arises under the United States Constitution and 42 U.S.C. § 1983. The court has personal jurisdiction over the County as a Texas county. Venue is proper in the Dallas Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Dallas County. Dallas County is in the Dallas Division of the United States District Court for the Northern District of Texas.

II.     Factual Allegations

   A.     Preliminary Statements

   4.     Plaintiff provides below the general substance of certain factual allegations. Plaintiff does not intend that those sections provide all allegations in detail. Rather, Plaintiff intends to give Defendant sufficient fair notice of the general nature and substance of Plaintiff's allegations and to demonstrate that Plaintiff's claims have facial plausibility. Whenever Plaintiff pleads factual allegations "upon information and belief," he is pleading that the specified factual contentions have or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Moreover, when Plaintiff quotes a document, conversation, or recording verbatim, or provides a person's name, Plaintiff has done his best to do so accurately and without any typographical errors even though some typographical errors may still exist.

   5.     Plaintiff pleads facts that give rise to, and thus asserts, conditions of confinement claims. Conditions of confinement claims require no deliberate indifference on behalf of a governmental entity or governmental actor. In the alternative, Plaintiff pleads facts that give rise to episodic act or omission claims. Regardless, pursuant to United States Supreme Court authority, Plaintiff need not assert specific constitutional claims in this pleading but rather must merely plead

facts that give rise to constitutional claims. Plaintiff thus asks the court to apply the correct legal theories to the facts pled.

6. Plaintiff is not pleading his "best case" and will only be able to do so after conducting discovery. Plaintiff does not intend to stand on this pleading but will seek leave to amend as further facts are developed or in the event any court determines that Plaintiff's live pleading is any manner deficient.

B.  Plaintiff's Unlawful Incarceration in the Dallas County Jail

7. Plaintiff makes allegations in this complaint regarding courts, offenses, dates, time credits, and similar issues related to Plaintiff's unlawful incarceration. Plaintiff does so to provide Defendant general fair notice of Plaintiff's allegations and claims, and to show that Plaintiff's claims have facial plausibility. Plaintiff has done Plaintiff's best to provide this information, but some errors might exist. Plaintiff will ultimately rely on underlying documents, to the extent they are accurate, to prove Plaintiff's allegations and/or possibly when engaging in any motion practice. Thus, Plaintiff does not "stand on" these allegations but reserves the right to amend his pleading and modify the allegations when documentary and/or other truthful, direct, objective evidence indicates that any errors in this pleading might exist. Plaintiff thus does not intent to make any judicial or similar admissions by pleading such facts.

8. Plaintiff was arrested and charged with Possession of a Controlled Substance in the 443rd Judicial District Court of Ellis County, Texas, in Cause No. 48132CR, with an alleged offense date of September 2, 2021 (First Possession Offense). After his arrest, Plaintiff was held in custody for five days from September 2, 2021, through September 7, 2021.

9. Plaintiff was placed on six months' community supervision on May 9, 2022, in County Criminal Court No. 1 of Dallas County, Texas, in Cause No. M2139220, for Theft of Property Valued under $100 with Previous Conviction (Theft Offense).

10. Plaintiff was charged with a second offense of Possession of a Controlled Substance in the 443rd Judicial District Court of Ellis County, Texas, in Cause No. 48807CR, with an alleged offense date of June 1, 2022 (Second Possession Offense). After his arrest, Plaintiff was held in custody from June 2, 2022, through August 22, 2022.

11. On May 15, 2023, Plaintiff pleaded guilty to both the First and Second Possession Offenses and was sentenced to 365 days' confinement for each offense to run consecutively. He received 333 days credit for time served for the First Offense and received 327 days credit for time served for the Second Offense. Plaintiff also began serving these consecutive sentences on May 15, 2023, and, after his credits for time-served were applied, Plaintiff was supposed to be released June 22, 2023. Instead, he was transferred to Dallas County on June 21, 2023.

12. On June 30, 2023, Plaintiff pleaded true to violating certain terms of his community supervision for the Theft Offense. Due to his incarceration in Ellis County, Plaintiff failed to comply with terms of his community supervision requiring him to report to his probation officer during June, July, and August 2022; to complete certain community service hours; and to pay certain delinquent supervision fees. As a result, Plainitiff was sentenced to five days' confinement in the Dallas County Jail, but he was to receive 10 days of credit for time served. Thus, Plaintiff should have been released immediately no later than June 30, 2023.

13. Plaintiff notified every officer and jail staffer he encountered that he was supposed to be released. Instead, Plaintiff was improperly held in the Dallas County Jail until on or around August 21, 2023, which was nearly two months after he was supposed to be released.

14. Plaintiff was illegally and unconstitutionally held past the terms of his sentence even though he notified officers and jail staffers of the error and asked to be released. Plaintiff's brother also called numerous places to try to get Plaintiff released, including Ellis County and

Texas Department of Criminal Justice (TDCJ). Plaintiff's brother also tried to call Dallas County to seek Plaintiff's release.

15. Plaintiff also filed approximately seven step-one grievances in the Dallas County Jail, explaining his situation in detail and referencing documentation that supported his claims. Only two grievances were answered, and they did not address the issues raised by Plaintiff. Plaintiff filed step-two grievances in response to the two answers he received to his step-one grievances. Plaintiff's step-two grievances were not answered. Upon information and belief, these grievances made their way to a certain level of jail management, such jail management having the ability to contact and/or communicate with jail policymakers.

16. Plaintiff's brother made phone calls almost daily and visited the Dallas County jail. During a visit to the jail, Plaintiff's brother finally convinced a jail supervisor to call Ellis County or TDCJ. Plaintiff was then finally released a few days later, on or around August 21, 2023.

### C.   Liability of Dallas County

#### 1.   Introduction

17. Plaintiff sets forth in this section additional facts and allegations supporting liability claims against the County pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and other applicable law. The facts asserted in this section are in addition to all facts asserted in this pleading to support liability claims based on County policies, practices, and customs. Policies, practices, and customs alleged in this pleading, individually or working together, were moving forces behind and caused the constitutional violations and damages referenced herein. This is true regardless of whether the facts show episodic acts or omissions or conditions of confinement. County policies, practices, and customs are pled individually and alternatively.

18. When the County incarcerated Plaintiff for nearly two months after he was legally and constitutionally required to be released, the County knew that its personnel, policies, practices, and/or customs were such that they could not or would not meet the County's constitutional obligations to (1) release Plaintiff from incarceration in accordance with the terms of his sentence; and (2) not incarcerate Plaintiff when the County had no lawful right to do so. Further, consistent action and inaction by County employees and/or agents, specifically regarding Plaintiff, confirm the policies, practices, and customs alleged in this complaint. The County made decisions about policy and practice that it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and custom that such practice and custom became the policy of the County as it related to its jail. Regardless, the Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the identity of chief policymakers at the pleading stage.

19. The County had several policies, practices, and customs that were moving forces behind, caused, were producing causes of, and/or proximately caused Plaintiff to be deprived of his constitutional right to liberty without due process of law. As applied only to episodic acts, if any, but not to conditions of confinement, the County made deliberate decisions, acting in a deliberately indifferent manner, when implementing or allowing such policies, practices, and customs to exist. Further, when the County implemented or consciously allowed such policies, practices, and customs to exist, the County knew with certainty that the result would be incarcerating inmates longer than the terms of their sentences allowed under applicable law or court orders.

2. Dallas County Policies, Practices, and Customs

20. Plaintiff lists beneath this heading County policies, practices, and customs that Plaintiff alleges, upon information and belief, caused, proximately caused, were producing causes

of, and/or were moving forces behind all damages referenced in this pleading. Thus, the County is liable for all such damages. These policies, practices, and customs worked individually or together to cause the damages asserted in this pleading. Plaintiff pleads conditions of confinement claims arising from policies, practices, and customs. Deliberate indifference is not an element of, or a requirement to prove, conditions of confinement claims. In the alternative, Plaintiff pleads episodic act or omission claims arising from policies, practices, and customs. Plaintiff pleads, to the extent necessary, that deliberate indifference underlying episodic act or omission claims, upon information and belief, occurred with regard to relevant actors. Regardless, Plaintiff asks that the Court to apply the correct law to the facts pled, as required by United States Supreme Court precedent.

21. Courts have recognized that it is exceedingly rare for a plaintiff to have access to, or personal knowledge of, specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery. Thus, at the pleading stage, a plaintiff is merely required to put a governmental entity on fair notice of the grounds for which it is being sued. Federal courts must rely on summary judgment to weed out unmeritorious claims. Plaintiff thus pleads the following policies, practices, and customs, which give rise to conditions of confinement claims, or in the alternative episodic act or omission claims:

- The County for years had a well-known flawed process for timely releasing inmates and repeatedly failed to timely release inmates in accordance with the terms of their sentences.

- The County's longstanding flawed process for timely releasing inmates was exacerbated by technological issues as early as May 2023, when the County began migrating case files from the County's 40-year-old Forvis criminal case management software system (Forvis) to Tyler Technologies' Odyssey criminal case management software system (Odyssey).

- Compounding these issues, the County retired Forvis before Odyssey was fully operational. This led to more time in jail for inmates after they had already served their sentences.

- The County ineffectually integrated Odyssey and failed to train Odyssey users, which also led to more delays in releasing inmates after they had fully served their sentences.

- Significant processing delays by the County resulted in inmates being held by the County without legal authority to do so for a matter of days, weeks, or even months past the end of their sentences.

- These processing issues delayed the release of many inmates. The County's repeated failures to timely release inmates in accordance with the terms of their sentences resulted in the significant deprivation of inmates' constitutional right to liberty.

- The County had nonexistent or ineffective policies in place to quickly process and address grievances filed related to detainees not being timely released from jail.

- The County had nonexistent or ineffective policies in place to quickly process and address information received from people outside the jail (such as Plaintiff's brother) related to detainees not being timely released from jail.

- The County had nonexistent or ineffective policies in place to quickly process and address information communicated orally by detainees (such as Plaintiff) related to detainees not being timely released from jail.

22. Upon information and belief, the County failed to reprimand and/or take remedial action against any employees or agents as a result of action or inaction related to Plaintiff's overdetention, thus confirming that the policies, practices, and/or customs that led to the overdetention were in fact County de facto policies.

### 3.   Other Incidents Demonstrating County Practices and/or Customs

23. Other incidents of overdetention in the County jail support *Monell* liability. The County jail was already experiencing multiple issues causing overdetention when the County transitioned to Odyssey. But the transition from Forvis to Odyssey threw the County's criminal

justice system into a near standstill. This significant problem led to more jail time for detainees after they were entitled to be released.

24. Capacity at the County jail was trending down until the transition to Odyssey on May 16, 2023. After that, the County jail population began rising and rose at least 7% to at least 88% capacity. Upon information and belief, this was in part because detainees were not being released on time in accordance with the terms of their sentences. The software transition was not properly tracking and managing detainee sentence release dates, which resulted in detainees being held past their release dates. This problem exacerbated a longstanding problem of the County not timely releasing detainees in accordance with the terms of their sentences. That and lack of access to the Adult Information System (AIS) platform used by the County prevented County employees from processing cases. Not having AIS access made it very difficult for the County clerk's office to get information from the County sheriff's department regarding the amount of backtime detainees had served, which information was required in order to correctly calculate when detainees should have been released. The County knew all of this information, and it likewise knew to a certainty that these occurrences would result in people being incarcerated with no legal authority to incarcerate them.

25. Detainee Jennifer Goolsby completed her sentence for a drug possession charge on June 29, 2023, but the County did not release her from jail until July 10, 2023. Her situation was not unique. The transition to Odyssey and County staff lacking access to information managed by the County jail led to significant processing delays. To release an detainee, the County receives paperwork from the criminal court and sends it to TDCJ. TDCJ then processes and transmits release paperwork to the County, which allows an inmate to be released. In Goolsby's case, upon information and belief, TDCJ did not receive her paperwork until on or around July 10, 2023, the

date of her release. Upon information and belief, TDCJ also did not receive *any* release paperwork from the County between at least June 28, 2023, and July 10, 2023, thus detainees likely were not being released during that time period.

26. Other inmates, whose identities are currently unknown to Plaintiff, upon information and belief, were held in custody for days, weeks, or even months beyond the end of their sentences. After the transition to Odyssey, release paperwork that ordinarily required hours to process took days, and a process that required days before took weeks, thus resulting in the County holding inmates longer than their required sentences. Failing to promptly release detainees, however, had been a problem in the County for years before the transition to Odyssey, but the transition further exacerbated already existing failures to release detainees on time in accordance with the terms of their sentences. There is simply no excuse for holding people captive without any legal authority to do so.

27. After the County's transition to Odyssey, detainees who had been court-ordered to be released were waiting, on information and belief, on average six days longer to be released than detainees had been waiting before the transition, but the actual delay for some detainees was up to several weeks or even months.

28. Criminal District Court Judge J.J. Koch said that a defendant in Dallas County entered into a plea agreement but had to wait one week past the date the inmate should have been released because of the transition to Odyssey. Judge Koch also acknowledged that he had heard about other delays in releasing people from jail. One inmate lost employment due to a five-day delay in being released. Judge Koch recognized that County management problems predated the transition to Odyssey but noted that the transition exacerbated those problems. He said the problem was an institutional problem within Dallas County—not based on the software transition itself but

instead based on the County not being "used to switching processes." A prior software transition in the County in the early 2000s also resulted in people in the County jail being unaccounted for, and upon information and belief, resulted in detainees not being released on time. The failure to release people when there was no longer any legal authority to hold them as prisoners was thus well-embedded in Dallas County policy, practice, and procedure. It was customary. Dallas County District Attorney John Creuzot noted that the issues with the software transition were not suprising because such changes in the County in the past had not gone well: "If you asked me did I expect it to go smooth, no . . . . If you asked me why, because it never has."

29. After the data migration to Odyssey, County employees did not have information regarding who was in the jail, what was going on in the jail, or the status of pending cases. Upon information and belief, this resulted in inmates being held past the time they should have been released in accordance with the terms of their sentences.

30. The transition from Forvis to Odyssey brought the County's criminal justice system to a near standstill, which has been described as, among other things, "a complete meltdown train wreck," "a disaster," "messing with people's lives," "ridiculous," and "worse than frustration." Attorneys could not access information regarding inmates' sentences. Some inmates got lost in the jail and could not be located for hearings or trials, which not only could delay releases but also could delay inmates getting needed medications.

### III.   Causes of Action

#### A.   Fourteenth Amendment Due Process Claims Under 42 U.S.C. § 1983

31. The Fourteenth Amendment guarantees that no state may "deprive any person of life, liberty, or property, without due process of law." Accordingly, the government cannot hold an inmate without the legal authority to do so, because that would deprive a person of his liberty

without due process of law. Detainees thus have the constitutional right to timely release from prison in accordance with the terms of their sentences.

32. In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72. The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

33. Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for any natural person's subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.

The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to any appropriate constitutional claims in this case. The court should not apply a subjective state of mind and/or deliberate indifference standard. The Supreme Court discarded the idea that a pretrial detainee should have such a burden.

34. This *Kingsley* section potentially applies, depending on the status of the law at application, only to any claims that ultimately might ever be asserted against natural persons, or any episodic act and/or omissions claims against Dallas County. Plaintiff makes no allegation or stipulation that deliberate indifference would necessarily be a requirement in such a situation. Regardless, deliberate indifference is not a requirement to show conditions of confinement claims against Dallas County. Further, Plaintiff currently has no intent to seek to add any natural persons as defendants to this case.

B.     Remedies for Violation of Constitutional Rights

35. In cases brought under 42 U.S.C. § 1983, damages are determined according to principles derived from the common law of torts. Therefore, for causes of action asserted in this complaint, Plaintiff seeks all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to Texas common law applicable to the tort claim for false imprisonment, and all related and supporting caselaw. The remedies and damages available to Plaintiff include but are not necessarily limited to actual damages, including but not necessarily limited to past and future damages for humiliation, shame, fright, mental anguish, and loss of enjoyment of life. He also seeks economic damages for lost wages and/or loss of earning capacity for losing the opportunity to work during the time of his unlawful incarceration. Plaintiff incorporates this remedies section into all sections in this complaint asserting cause(s) of action.

  C. Cause of Action against Dallas County under 42 U.S.C. § 1983 for Violation of Constitutional Rights

  36. In the alternative, without waiving any other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Dallas County is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for violating Plaintiff's constitutional right not to be deprived of liberty without due process of law by being held in jail after the date he was entitled to be released in accordance with the terms of his sentence. This right is guaranteed by at least the Fourteenth Amendment to the United States Constitution.

  37. The County's employees and agents acted or failed to act under color of state law at all relevant times. The County's policies, practices, and customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of Plaintiff's damages.

  38. The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate chief policymaker(s) at the pleadings stage. Nevertheless, out of an abundance of caution, the County sheriff was the County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the County's jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker.

  39. The County was deliberately indifferent regarding policies, practices, and customs developed or used with regard to issues addressed by allegations set forth above, for any facts that are ultimately determined to support episodic act or omission claims. Deliberate indifference is not an element of a conditions of confinement claim. Policies, practices, and customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused

the violation of Plaintiff's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. Once again, by including the "deliberate indifference" allegation, Plaintiff is not conceding or alleging that deliberate indifference is a necessary element of a conditions of confinement claim. It is not.

40. Plaintiff suffered injuries for his humiliation, shame, fright, mental anguish, and loss of enjoyment of life for which he seeks recovery. He also seeks economic damages for lost wages and/or loss of earning capacity for losing the opportunity to work during the time of his unlawful incarceration. Moreover, Plaintiff seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

IV. Concluding Allegations and Prayer

    A. Conditions Precedent

41. All conditions precedent to assertion of all claims herein have occurred.

    B. Use of Documents at Trial or Pretrial Proceedings

42. Plaintiff intends to use at one or more pretrial proceedings and/or at trial all documents produced by Defendant in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

    C. Jury Demand

43. Plaintiff demands a jury trial on all issues that may be tried to a jury.

    D. Prayer

44. For these reasons, Plaintiff asks that Defendant be cited to appear and answer, and that Plaintiff have judgment for damages within the jurisdictional limits of the court and against

Defendant, as legally available and applicable, for all damages referenced above and below in this pleading:

    a)     actual damages including but not necessarily limited to past and future damages for humiliation, shame, fright, mental anguish, and loss of enjoyment of life suffered by Plaintiff;

    b)     actual damages including but not necessarily limited to economic damages for lost wages and/or loss of earning capacity for losing the opportunity to work during the time of his unlawful incarceration;

    c)     reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

    d)     court costs and all other recoverable costs;

    e)     prejudgment and postjudgment interest at the highest allowable rates; and

    f)     all other relief, legal and equitable, general and special, to which Plaintiff is entitled.

Respectfully submitted:

Law Offices of Dean Malone, P.C.

   /s/ T. Dean Malone
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:  (214) 670-9989
Telefax:     (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
jennifer.kingaard@gmail.com
Alexandra W. Payne
Texas State Bar No. 24118939
alexandra.payne@deanmalone.com
Abrielle Perry
Texas State Bar No. 24124419
abrielle.perry@deanmalone.com
Angelika Anderson
Texas State Bar No. 24136709
angelika.anderson@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:      (214) 670-9989
Telefax:           (214) 670-9904

Attorneys for Plaintiff